**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0867n.06

No. 09-1677

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JAY H. MORNINGSTAR, | ) | |
| Plaintiff-Appellant, | ) ) ) | **FILED**<br>*Dec 21, 2011*<br>LEONARD GREEN, Clerk |
| v. | ) ) | |
| KIM L. WORTHY, | ) ) | |
| Defendant, | ) ) ) | ON APPEAL FROM THE<br>UNITED STATES DISTRICT<br>COURT FOR THE EASTERN<br>DISTRICT OF MICHIGAN |
| and | ) ) | |
| CITY OF DETROIT; DETROIT POLICE DEPARTMENT; DEBORAH ROBINSON; JAMES TOLBERT; GLENN DAVIS; KENNETH GARDNER; TAWNYA KING; CHARLES ZWICKER; TYRINE WHEATLEY; LISA BRYSON (MIX); and JEANETTE WILLIAMS-WHITE, | ) ) ) ) ) ) ) ) ) ) ) | **O P I N I O N** |
| Defendants-Appellees. | ) | |

_____

Before: MERRITT, COOK and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Jay Morningstar appeals the district court's

orders granting the City of Detroit and the two remaining individual defendants, Wheatley and

Bryson (Mix), judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, in this

- 1 -

action alleging municipal liability by the City and gross negligence and malicious prosecution by Wheatley and Mix.  We **AFFIRM**.

## BACKGROUND

### A.    Death of Eric Williams

In the early morning of April 14, 2005, Michigan State Trooper Jay Morningstar was driving a squad car in downtown Detroit with his partner, Trooper Theresa Maylone, when they observed a man standing in the middle of a crosswalk in front of a local bar.  The man wore an oversized coat and his pants were lowered to his ankles; he appeared to be arguing with someone on the sidewalk.  Morningstar stopped his vehicle, activated the emergency overhead lights and stepped out to investigate.  Looking deranged and angry, the man turned and advanced toward Morningstar, his hands concealed by his heavy coat.  Morningstar stood next to his car, drew his service weapon and yelled for the man to stop.  However, the man ignored the command, reached the front of the vehicle and continued to approach to within a few feet of Morningstar.  Allegedly fearing that the man had a weapon concealed in his coat, Morningstar fired a single shot.[1]  Fatally wounded, the man collapsed onto the hood of the car; he was later identified as Eric Williams, a homeless person known to local law enforcement.  Williams was unarmed.

---

[1]It is not clear how fast the man advanced or how close he was to Morningstar when the shot was fired.  The bullet followed a downward trajectory through the body, suggesting that the man's body was tilted forward, possibly lunging or charging ahead, when he was struck by the bullet.

As these events transpired, Detroit Police Officer Tyrine Wheatley and his partner, Officer Lisa Bryson ("Mix"),[2] were in their squad car responding to a radio dispatch of a disturbance involving a man with his pants down in the middle of the street. Wheatley was familiar with Eric Williams from several prior interactions with him, and based on the radio broadcast, Wheatley suspected that the disturbance involved Williams. Mix and Wheatley reached the scene just as Morningstar and his partner pulled up in their car. Mix and Wheatley observed the entire incident, which was also captured by a digital camera mounted on their vehicle. However, the video had no sound component and the officers neglected to turn on their personal recording devices. This lawsuit arises from Mix's and Wheatley's statements and testimony concerning these events.

## B. Morningstar's Criminal Prosecution

After the incident, Morningstar and Maylone wrote separate reports describing what had happened; both reports indicated that Morningstar had ordered Williams to stop before firing his gun. Mix and Wheatley also wrote reports, but neither mentioned whether Morningstar told Williams to stop. The Detroit Police Department ("DPD") also prepared an Investigator's Report, which identified a number of witnesses, including three civilians who were interviewed at the scene by Michigan State Police ("MSP") investigators and who provided statements saying that Morningstar ordered Williams to stop several times before firing the fatal shot.[3]

---

[2]Officer Bryson changed her last name to Mix some time after these events. For simplicity, the Court refers to her as "Mix."

[3]David Patrick Zmuda stated that Williams approached Morningstar in an aggressive manner and that Morningstar ordered Williams to "Stop, stop" and show his hands. Edward Joseph Collica saw Williams advance threateningly and heard Morningstar yell at him to stop; Mr. Collica also

These incident reports and witness interviews were provided to Assistant Wayne County Prosecutor Robert Donaldson, who was responsible for determining whether to file criminal charges in relation to Williams's death. On April 19, 2005, Donaldson interviewed Mix and Wheatley under subpoena. Wheatley claimed that he and Mix were outside of their squad car and standing on the street when Williams was shot, but Mix did not specify where she was when the shooting occurred. Wheatley also testified that Morningstar did not warn Williams before firing at him, but upon further questioning, he acknowledged that Morningstar may have said something he did not hear. Mix stated that she did not hear Morningstar say anything, but added that she saw him gesture toward Williams as if motioning him to stay back. Upon concluding his investigation, Donaldson prepared a report recommending that charges be filed; based on this recommendation, the prosecutor's office formally charged Morningstar with second-degree murder and statutory manslaughter.

On June 21, 2005, Judge Joseph N. Baltimore of Detroit's 36th District Court held a preliminary examination to determine whether to bind Morningstar over for trial. Wheatley was the only fact witness presented at this proceeding. He testified that he was standing on the street when Williams was killed, that he heard the shot being fired, but that he did not hear any prior warning by Morningstar. Based on Wheatley's testimony and the footage from the in-car camera, Judge

---

opined that Morningstar acted in self-defense. William Reed was a patron at the bar outside of which the incident took place. He recounted that, immediately before the incident, Williams walked into the bar speaking unintelligibly, grabbed Mr. Reed and pinned his arms behind him until the bar staff made him leave. Mr. Reed told MSP that he observed the shooting from inside the bar and heard Morningstar give a commanding but unintelligible order, like "Stop," before shooting Williams.

Baltimore found probable cause to bind Morningstar over for trial on both counts. A jury ultimately

acquitted Morningstar of all charges.

## C.     Morningstar's Action for Damages

Morningstar initiated this civil action on March 14, 2006, stating six claims for damages

against twelve defendants including the City of Detroit ("the City"). In the ensuing litigation, the

case was reduced to one municipal-liability claim under 42 U.S.C. § 1983 against the City, and state-

law gross-negligence and malicious-prosecution claims against Mix and Wheatley.[4] Morningstar's

gross-negligence claim alleged that Mix and Wheatley made false or misleading statements that

resulted in Donaldson's finding probable cause to charge Morningstar with murder. Morningstar's

malicious-prosecution claim proceeded on two theories – first, that Mix and Wheatley "initiated"

Morningstar's prosecution by making false statements on which Donaldson relied; second, that

Wheatley "continued" his prosecution by providing false testimony at the preliminary examination,

---

[4]On September 6, 2007, the district court issued an order granting motions to dismiss by several defendants and allowing Morningstar's remaining claims to go forward. The court held that Morningstar properly stated a claim that, by providing false testimony, Mix and Wheatley violated his Fourth Amendment rights. However, in a footnote, the court added:

> To the extent that Plaintiff's Fourth Amendment claim against Wheatley turns on Wheatley's alleged false testimony at the preliminary examination, Wheatley is entitled to absolute testimonial immunity from such a claim. However, because "[i]mmunity regarding testimony . . . does [not] 'relate backwards' to events that transpired prior to testifying, even if they are related to the subsequent testimony," Wheatley is not entitled to absolute testimonial immunity for the alleged falsification of his incident report and false statements to the prosecutor.

(R. 27, at 17 n.11 (first alteration in original, quoting and citing *Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2002)).)

causing Judge Baltimore to bind him over for trial. The grounds for Morningstar's malicious-continuation-of-prosecution claim against Mix were never clearly established.

At trial, Morningstar called Grant Fredericks, a forensic video analyst, to testify about the footage recovered from Mix's and Wheatley's in-car camera. By dissecting the video's individual frames, Fredericks established that Mix and Wheatley were still in their car when Williams was shot. Fredericks also analyzed a sound recording of the interior of the vehicle and determined that Mix and Wheatley could not have heard the shot because they had loud music on the radio and their windows were closed. Based on this testimony, Morningstar argued that Mix and Wheatley lied when they testified that he shot Williams without prior warning.

Fredericks also testified that, at the time of these events, DPD had replaced its older in-car cameras with a new digital recording system. Unlike its analog forebears, this system had difficulty capturing rapid motion and bright light, which sometimes resulted in an inaccurate depiction of actual events.[5] These deficiencies, Fredericks opined, would have been "painfully obvious" to anyone familiar with the older system. Fredericks also observed that, at the time of this incident, DPD's policies and procedures still referred to analog video systems and did not reflect the transition

---

[5]Fredericks identified two sections of the video that inaccurately or incorrectly depicted the events that led to Williams's death. At one point, as Williams advanced toward Morningstar, his legs and feet seemed to disappear; Fredericks testified that this effect suggested a fast movement forward or a lunge, which the camera failed to capture. In another instance, Williams appeared to take a step back when, in fact, he was walking toward Morningstar. Fredericks explained that the camera's mistake likely affected Mix's and Wheatley's recollections of the event because, in subsequent testimony, they described Williams as going backwards, when in fact he did not. Fredericks also testified that, since the events of this case, DPD officials had become aware of the problem and updated their entire video-recording system.

to digital. Fredericks explained that lack of proper training increased the risk of errors in video manipulation and authentication, as well as breaks in the chain of custody. Morningstar used this testimony to argue that the City's failure to offer proper training in the use of digital equipment led officers to rely on inaccurate visual records to establish probable cause and to exploit flaws in the system to fabricate testimony and cover up lies.

After Morningstar rested, the defense moved for a judgment as a matter of law on all claims pursuant to Fed. R. Civ. P. 50(a). The district court granted the motion as to the City but denied it as to Mix and Wheatley.

Mix and Wheatley presented a single witness, Assistant Prosecutor Donaldson. Donaldson testified that, when determining whether there was probable cause to charge Morningstar, he reviewed the video of the incident multiple times, interviewed at least ten witnesses and examined DPD and MSP records. Asked what materials he relied on most, Donaldson answered that he considered the totality of the evidence, but that witness testimony and the video recording convinced him that there was no justification to shoot Williams under the circumstances. Donaldson testified that, despite Mix's and Wheatley's statements to the contrary, he assumed that Morningstar told Williams to stop before firing at him. He also asserted that Mix's and Wheatley's statements did not affect his decision to charge Morningstar. Donaldson denied suggestions that he attributed more weight to police witnesses than to civilians in police-shooting cases; however, he seemed to suggest that he gave special consideration to police officers who testify against other officers because of the inherent difficulty in incriminating a colleague.

Upon resting, the defense renewed its earlier motion for judgment as a matter of law under Rule 50(a); however, Wheatley did not raise testimonial immunity this time. The district court granted the motion as to Morningstar's gross-negligence and malicious-initiation claims against both defendants; in addition, the court granted the motion as to the malicious-continuation claim against Mix and dismissed her from the lawsuit. The court thus referred a single issue to the jury – whether Wheatley maliciously continued criminal proceedings against Morningstar by giving false testimony at the preliminary examination. On January 21, 2009, the jury returned a verdict awarding Morningstar $250,000 in compensatory damages, $100,000 over twenty years in future damages, and $150,000 in punitive damages, for a total of $500,000.

After the verdict, Wheatley renewed his earlier motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). In particular, Wheatley argued that, under the doctrine of testimonial immunity, he was not civilly liable for statements made at the preliminary examination. On April 23, 2009, the district court granted Wheatley's motion. Morningstar timely appealed.

## DISCUSSION

Morningstar first contends that the trial court erred in entertaining Wheatley's belatedly asserted legal defense that his preliminary-examination testimony was protected by testimonial immunity. Morningstar also claims the court erred in granting judgment as a matter of law on his municipal-liability claim against the City, as well as on his gross-negligence and malicious-prosecution claims against Mix and Wheatley.

A.      **Waiver of Immunity Defense**

Morningstar's malicious-continuation-of-prosecution claim against Wheatley alleged that

Wheatley provided false testimony at the preliminary examination, thereby contributing to Judge

Baltimore's decision to bind Morningstar over for trial.  After the jury rendered its verdict, Wheatley

moved for judgment as a matter of law on testimonial-immunity grounds, which the district court

granted.  Morningstar challenges this ruling and argues that Wheatley waived testimonial immunity

as a defense in three ways:  (1) by failing to raise it; (2) by failing to adequately preserve it in his

Rule 50(a) motion; and (3) by admitting the transcript of the preliminary examination into evidence.[6]

1.      **Failure to Raise and Preserve**

"A district court's allowance of an affirmative defense that purportedly was not raised in a

timely manner is reviewed for abuse of discretion."  *Mickowski v. Visi-Trak Worldwide, LLC*, 415

F.3d 501, 506 (6th Cir. 2005) (citation omitted); *see also English v. Dyke*, 23 F.3d 1086, 1090 (6th

Cir.1994) ("[T]he trial court has discretion to find a waiver if a defendant fails to assert the defense

within time limits . . . or if the court otherwise finds that a defendant has failed to exercise due

diligence or has asserted the defense for dilatory purposes." (citations omitted)).

An affirmative defense which is not raised in a responsive pleading is not necessarily waived

if the other party receives notice of the defense by some other means.  *Seals v. Gen. Motors Corp.*,

___

[6]Morningstar also professes to challenge the merits of Wheatley's defense, but fails to address
the issue or cite to *Maiden v. Rozwood*, 597 N.W.2d 817 (Mich. 1999), and *Briscoe v. Lahue*, 460
U.S. 325 (1983), the leading state and federal authorities on testimonial immunity.  "It is a settled
appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived."  *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir.
2004) (quotation marks and citation omitted).

546 F.3d 766, 770 (6th Cir. 2008). However, the initial failure to plead immunity may work as a partial waiver depending on when the defense is finally raised. *See English*, 23 F.3d at 1090 ("[F]or example, a defendant who fails to timely assert the defense prior to discovery may waive the right to avoid discovery but may nonetheless raise the issue after discovery on summary judgment or at trial." (citing *Kennedy v. Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986))). Finally, in some cases, "a plaintiff may be so prejudiced by a defendant's failure to raise the defense, especially when the delay was intentional, that the trial court may decide the defense is completely waived." *Id.* at 1090 n.1.

Having presided over the entire proceedings, the district court was well aware of the circumstances surrounding Wheatley's assertion of testimonial immunity. The district court's opinion reflects that it took these circumstances into account in deciding that Wheatley did not waive the defense:

> Although defense counsel's performance in this case has been somewhat less than commendable, the Court does not find that his conduct justifies a holding that Defendant completely waived or abandoned testimonial immunity as a defense. When considering a delay in raising the defense of qualified immunity, the Sixth Circuit held that "the trial court has discretion to find a waiver if a defendant fails to assert the defense within time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes." *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir.1994). In this case, defense counsel was slow to raise the issue of testimonial immunity and, when he did raise it, he failed to pursue it aggressively.[6] Nonetheless, defense counsel did raise the defense in his first motion for directed verdict at the close of Plaintiff's proofs, mentioned it again during discussion of a jury question, and has now presented the argument to the Court in his motion for relief for judgment.[7] While the Court would have preferred that Defendant raise the issue of testimonial immunity in a pretrial motion for summary judgment, the Court cannot conclude that he completely waived the defense by failing to do so. Indeed, Rule 12 of the Federal Rules of Civil Procedure specifically allows parties to wait until trial to raise legal defenses. Fed.R.Civ.P. 12(h)(2).

[6]In lieu of filing an answer to Plaintiff's complaint, defense counsel initially filed a motion to dismiss but did not assert testimonial immunity as a defense in that motion. After that motion was denied in part, the case proceeded through discovery and defense counsel let the dispositive motion deadline pass without filing any additional motions. Defense counsel first raised the issue of testimonial immunity in a motion for directed verdict at the close of Plaintiff's proofs at trial. In making that motion-one which consumes sixteen pages of transcript-defense counsel made a single, almost fleeting reference to the defense of testimonial immunity. When denying the motion for directed verdict, the Court did not specifically address the testimonial immunity argument. Defense counsel, however, did not request a ruling on that defense nor did he reassert testimonial immunity as a defense in his second motion for directed verdict, which took place after he had rested and before the case went to the jury. Rather, defense counsel waited until the jury sent out a question regarding "probable cause" to argue again that his client was shielded from liability based on testimonial immunity.

[7]In arguing that Defendant's assertion of testimonial immunity is untimely, Plaintiff cites several cases that prohibit the use of error as an "appellate parachute." Because this case is not yet on appeal, these cases are not useful to the Court's analysis.

*Morningstar v. City of Detroit*, 617 F. Supp. 2d 570, 575-76 (E.D. Mich. 2009) (citations to record omitted).

Morningstar asserts that Wheatley's failure to raise testimonial immunity before trial was dilatory and a deliberate attempt to surprise the district court and Morningstar's attorney so as to prevent them from properly addressing the issue. However, the district court did not find that Wheatley purposely deferred raising testimonial immunity in order to gain an advantage in the litigation. To the contrary, the court found that the delay in asserting the defense was due to ineptitude rather than gamesmanship.

Morningstar also argues that, by mentioning testimonial immunity for the first time in his Rule 50(a) motion, Wheatley violated this circuit's requirement to specifically bring affirmative defenses to the trial court's attention. *See Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002) ("The mere fact that an obscure reference to [an affirmative defense] is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal." (quoting *Walsh v. Mellas*, 837 F.2d 789, 800 (7th Cir. 1988) (alteration in *Crowley*))). However, preservation for appellate purposes is not at issue here. Since the district court exercised its discretion to rule on testimonial immunity, the issue is clearly preserved.

Nor did the district court abuse its discretion in concluding that Wheatley did not waive the defense by failing to assert it. A pre-verdict motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a). The corollary to this rule is that "[a] post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion." *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006). However, a pretrial motion need not identify with "technical precision" the grounds upon which it rests. *Id.* Rather,

> [b]ecause the requirement that a Rule 50(a) motion must precede a Rule 50(b) motion is "harsh in any circumstance," a Rule 50(a) motion should not be reviewed narrowly but rather in light of the purpose of the rules to secure a just, speedy, and inexpensive determination of the case. Accordingly, where Rule 50(a)'s purpose -- i.e., providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury -- has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion.

*Id.* (quoting *Anderson v. United Tel. Co. of Kan.*, 933 F.2d 1500, 1504 (10th Cir.), *cert. denied*, 502

U.S. 940 (1991); citing *Rankin v. Evans*, 133 F.3d 1425, 1432-33 (11th Cir.), *cert. denied*, 525 U.S.

823 (1998)).

At the close of Morningstar's proofs, defense counsel moved orally for judgment as a matter

of law on all claims, including those against Mix and the City. Counsel's lengthy argument included

a discussion of Wheatley's preliminary-examination testimony and the following statement:

> Now, my point on that is persons who testify at trial, particularly police officers, have
> testimonial immunity. So, even if he did lie, that is, Officer Wheatley stating that he
> was out of the car and that he didn't hear any warnings, he would have testimonial
> immunity to the extent that's found by this Court that that, in fact, happened.

(R. 67, at 97-98.) The trial court aptly described this single reference to testimonial immunity as

"almost fleeting." *Morningstar*, 617 F. Supp. 2d at 575 n.6. Nevertheless, counsel expressly

identified the defense and the context in which it should apply, and we cannot say that the district

court abused its discretion in concluding that this was sufficient to preserve the defense for a post-

verdict motion. *See Kusens*, *supra*.

### 2. Admission of Preliminary-Examination Transcript

During his direct examination of Grant Fredericks, Morningstar's attorney sought to admit

the transcript of the preliminary examination into evidence, but the defense objected on hearsay

grounds. Later, while cross-examining Fredericks, the defense moved to admit the transcript; this

time, Morningstar objected and the court took the motion under advisement. After Morningstar

rested, the defense called Donaldson to testify and again moved to admit the transcript, this time

without objection. In opposing Wheatley's Rule 50(b) motion, Morningstar argued that, having

moved to admit the transcript, Wheatley could not change course after the jury verdict and argue that

his statements were protected by testimonial immunity. The district court rejected this argument,

concluding that Wheatley was entitled to pursue alternative defenses and to offer the transcript in

support:

> Plaintiff also argues that Defendant waived the testimonial immunity defense by admitting the transcript of his preliminary examination testimony as an exhibit for the jury's consideration. In support of this argument, Plaintiff cites cases where criminal defendants have been barred from obtaining reversals of their convictions on grounds that testimony elicited *for their defense* was improperly admitted. *People v. Riley*, 465 Mich. 442, 448, 636 N.W.2d 514, 517 (2001); *Hicks v. Sherman*, No. 04-cv-179, 2007 U.S. Dist. LEXIS 55983, 2007 WL 2238675, at *7 (W.D. Mich. Aug. 1, 2007) . . . . The Court concludes, however, that these cases have no bearing on the present case.
>
> Unlike the attorneys in the aforementioned cases, defense counsel effectively objected to the use of the preliminary examination transcript when he raised the issue of testimonial immunity in his first motion for a directed verdict. Faced with the Court's denial of his motion, however, defense counsel pursued alternative defenses to Plaintiff's malicious prosecution claim, including arguments that Defendant's testimony was not false or misleading and was not a cause of Plaintiff's continued prosecution. To effectively present these arguments, defense counsel needed to place the content of Defendant's preliminary examination testimony before the jury. Defense counsel's pursuit of these alternative defenses was reasonable in light of the Court's ruling on the motion for a directed verdict and specifically permitted by Rule 8 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 8(d) (allowing parties to plead alternative and inconsistent defenses). The Court therefore concludes that defense counsel's admission of the preliminary examination transcript did not waive Defendant's right to pursue testimonial immunity as a defense.

*Morningstar*, 617 F. Supp. 2d at 576.

Morningstar argues that the district court's reasoning ignores that Wheatley tried to admit

the transcript during Morningstar's proofs, before filing the first Rule 50(a) motion. He contends

that under the doctrines of invited error and judicial estoppel Wheatley could not properly seek to admit the transcript and then rely on testimonial immunity for his defense.[7]

Under the doctrine of invited error, courts can "prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 490-91 (6th Cir. 2008) (quotation marks and citation omitted). However, this doctrine simply prevents the party who induces the error from challenging it at a later stage of the case to set aside immediate consequences of the error. *See id.* ("Having induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error." (quotation omitted)). We fail to see how defense counsel induced the court to make an erroneous ruling where counsel did not argue against testimonial immunity.

The instant case poses the question whether a party who introduces evidence (*i.e.*, the transcript) while preserving the affirmative defense of testimonial immunity forfeits the ability to assert that defense in the same proceeding. More to the point, testimonial immunity does not render the preliminary-examination transcript inadmissible in itself. It simply provides that Wheatley cannot be held civilly liable for what is recorded in that transcript. Thus, Wheatley's reliance on the

---

[7]Morningstar also invokes the doctrine of invited response, according to which the reviewing court must weigh the impact of one party's responsive remarks, as well as the other party's remarks to determine whether the allegedly improper responsive remarks were prejudicial. *United States v. Young*, 470 U.S.1, 12 (1985). However, the invited-response doctrine is used to determine whether one party's improper remarks during trial had such an effect on the entire proceeding as to require reversal. *See United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993). Thus, it is inapposite.

transcript as evidence to negate the factual allegations did not forfeit the legal defense of testimonial immunity.

Morningstar also relies on the doctrine of judicial estoppel, which holds that "a party who has *successfully* and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding." *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010). Wheatley has not changed his position on the issue of testimonial immunity. His post-verdict motion was not based on error in the admission of the transcript; rather, it was based on the legal defense of testimonial immunity. Therefore, judicial estoppel is inapplicable here.

In summary, we find no error or abuse of discretion in the district court's decision to address the merits of the testimonial immunity defense, and we affirm the district court's decision not to apply judicial estoppel, after a *de novo* review. *See Lorillard Tobacco v. Chester, Wilcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (applying de novo standard of review to decisions on judicial estoppel). And, because Morningstar does not argue that the district court's decision on the merits was erroneous, we affirm.

## B.     Morningstar's Other Claims

At trial, the district court ruled against Morningstar as a matter of law on his gross-negligence and malicious-initiation-of-prosecution claims against Mix and Wheatley and his 42 U.S.C. § 1983 claim against the City. Morningstar appeals each ruling.

This Court reviews *de novo* the grant of a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) or (b). *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005). The inquiry on a Rule 50 motion is the same as on a motion for summary judgment under Rule 56. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Judgment as a matter of law is appropriate when, viewing all record evidence and drawing all reasonable inferences in favor of the nonmoving party, *Reeves*, 530 U.S. at 150, there is "no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)). In making its determination, the district court cannot weigh the evidence or make credibility assessments. *Liberty Lobby*, 477 U.S. at 255.

### 1. Gross-Negligence Claims Against Mix and Wheatley

Morningstar's gross-negligence claim is predicated on his contention that Mix and Wheatley were grossly negligent when they testified under subpoena that Morningstar did not warn Williams to stop before shooting him. Morningstar alleges that Mix and Wheatley's false or misleading statements led Assistant Prosecutor Donaldson to recommend filing criminal charges against him.

Under Michigan law, government employees acting within the course of their employment are immune from tort liability for injury to others if the conduct in question "does not amount to gross negligence that is *the* proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c) (emphasis added). The statute defines gross negligence as "conduct so reckless as

to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 691.1407(7)(a).

Showing that the conduct in question was *a* proximate cause is not enough; rather, the plaintiff must show that the employee's gross negligence was "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 311 (Mich. 2000). Therefore, to succeed on his gross-negligence claim, Morningstar must prove that Mix and Wheatley's false statements were *the* proximate cause of Donaldson's probable-cause determination.[8]

The district court found no evidence that Mix's or Wheatley's statements proximately caused the initiation of criminal proceedings against Morningstar. Ruling from the bench, the court stated: "Mr. Donaldson testified about the many, many things he included and in specific [sic], he indicated that he assumed, in making his judgment as to whether or not to charge these defendants, he assumed there was the command given as the Plaintiff testifies." (R. 67, at 243.) Morningstar contends that, in making its determination, the district court improperly accepted as true Donaldson's testimony that Mix's and Wheatley's statements were not the proximate cause of his decision to prosecute. He argues that a reasonable jury could have found that, absent Mix's and Wheatley's statements, Donaldson would not have had sufficient evidence to find probable cause.

Morningstar is correct that because the jury was not obliged to believe Donaldson's testimony that he assumed that Morningstar warned Williams before shooting him, the court could not properly

---

[8]To recommend filing a second-degree-murder charge, Donaldson had to find probable cause to believe that Morningstar killed Williams with malice and without justification or excuse. *See People v. Roper*, 777 N.W.2d 483, 490 (Mich. Ct. App. 2009) ("[T]o convict a defendant of second-degree murder [in Michigan], the prosecution must prove: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse.").

grant judgment based on that testimony alone. *See Reeves*, 530 U.S. at 151 ("[A] court should give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." (internal quotation marks and citation omitted)). Nevertheless, Morningstar had to establish that based on the evidence, a reasonable juror could conclude that Mix's and Wheatley's alleged gross negligence was *the* proximate cause of Donaldson's decision to seek a warrant. This he failed to do.

Donaldson testified that he considered the totality of the evidence in deciding whether to recommend that Morningstar be charged, particularly the video tape and the witnesses' accounts of the incident. This included witness statements that Morningstar ordered Williams to stop twice before shooting. Donaldson also testified that his recommendation was reviewed and approved by his superiors in the Wayne County Prosecutor's Office. Afterward, when Donaldson sought the warrant, DPD's Investigator's Report was submitted to the issuing magistrate in support of the warrant request. That report included the following:

> The investigation reveals that the decedent, Eric Williams, had entered the Detroiter Bar at 655 Beaubien, and began harassing the customers by demanding money and creating a disturbance. The police were requested as he was escorted from the premises. Once outside, he broke out two of the front windows of the bar. As he walked into the street he began to approach the troopers *who were heard to order him to stop at least two separate times*. Mr. Williams continued to approach the officers and though apparently unarmed, was shot by Trooper Morningstar.

(R. 73-13, at 1 (emphasis added).)

The initial statements given by Mix and Wheatley did not state whether they observed the events from inside or outside their squad car; nor did they state whether they heard Morningstar warn

Williams before shooting him. To the contrary, their written reports did not address either of these subjects.

In her subpoenaed testimony, where she was examined by Donaldson under oath, Mix was never asked when she exited her squad car, and never stated where she was when the shooting occurred. The extent of her testimony on this subject and the subject of what she heard was as follows:

Q:     Could you hear what was going on when you came out?
A:     No.
Q:     Could you hear Mr. Williams saying anything?
A:     No.
Q:     Could you hear the officer saying anything?
A:     No.

(R. 73-10, at 8-9.) Officer Mix also testified that when Morningstar exited the State Police vehicle, Williams had approached the vehicle to the point where he was between the door and the hood of the car, "where you open the door." The prosecutor then asked:

Q:     And that's when the shot was fired?
A:     Yes. Once he exited the vehicle first, then he drew his weapon. He was holding his hand for it, but he drew out his weapon and he shot (indicating).
Q:     You extended you left arm forward and had your arm out and gestured with your right hand just now. Do I have that right?
A:     Yes. From that I can remember he extended his left hand out, drew out the weapon. He pointed it. He shot.

(*Id.* at 10-11.) Mix also testified that Morningstar repeatedly said "Please don't die" as he was administering first aid to Williams. She further testified:

Q:     Did you have any discussions with that trooper about the circumstances of the shooting, or what led him to do the shooting?

A:      Well, in the beginning I went over there and I asked him, you know, basically when we got him down and made sure he had a pulse, and made sure he was still breathing, I asked him what happened. He said he thought he had something or was digging in his pockets or something. I don't know. As far as that, he didn't discuss nothing no further.

(*Id.* at 12.) After Donaldson completed his examination, a DPD officer asked Mix:

[Q]:    When you indicated the officer was with his left hand out, in your opinion was that him telling the man to stop, or you just way a hand out, and you don't know what that was?

[A]:    Well, from him having his hand out like that, you know, if I'm pretty much trying to guess at it, it was for stay back, but I didn't hear any verbal answers.

(*Id.* at 13.)

In his subpoenaed testimony, Wheatley responded to Donaldson's questions by stating that when he and Mix arrived on the scene, the Michigan State Troopers were still in their car; the troopers got out of their car slightly before he and Mix got out of their squad car; Williams was moving toward the troopers' car when he and Mix got out of their squad car; Williams took approximately three or four steps toward the troopers' car while the troopers were outside their car. The questioning continued:

Q:    Do you hear Mr. Williams say anything?
A:    No, I do not.
Q:    Do you hear either of the troopers say anything?
A:    No, I do not.
Q:    Is it because he [sic] didn't happen, or could it have happened and you not heard it?
A:    There is a possibility it could have happened and I did not hear it.

(R. 73-15, at 9.)

Given the uncontradicted testimony that Donaldson had all the witnesses' statements, including Morningstar's and his partner's, as well as those that recalled that Morningstar ordered Williams to stop, that neither Mix nor Wheatley affirmatively asserted that Morningstar failed to advise Williams to stop, and that the warrant request included as fact that Morningstar had ordered Williams to stop, a reasonable juror could not have concluded that Wheatley's and Mix's statements and testimony were "the one most immediate, efficient, and direct cause" of Donaldson's decision to seek a warrant.[9] *Robinson*, 613 N.W.2d at 311.

Nor can it be argued that Wheatley's and Mix's statements must have been *the* proximate cause of Donaldson's decision to go forward because without their statements there was insufficient basis to proceed. Under Michigan law,[10] a reasonable person could find probable cause to charge

---

[9]Morningstar also argues that Donaldson was naturally predisposed to give more weight to statements by police officers than to civilian testimony, especially in cases where, as here, the officers' statements tend to incriminate a fellow officer. However, Morningstar did not argue, either at trial or on appeal, that Donaldson's alleged bias was an intervening cause of his injury, of which Mix and Wheatley were aware or should have known. Nor did he mention intervening cause as a legal theory or cite to any Michigan case law. Therefore, this issue is waived. *Cf. Fitts v. Sicker*, 232 F. App'x 436, 442 (6th Cir. 2007) (deeming waived an issue cited in notice of appeal but not mentioned in appellant's brief); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)).

[10]In Michigan, "[g]enerally, a defendant is not entitled to use any more force than is necessary to defend himself." *Roper*, 777 N.W.2d at 491-92 (citation omitted). A killing in self-defense is justifiable homicide "if, under all the circumstances, the defendant honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force." *People v. Riddle*, 649 N.W.2d 30, 46 (Mich. 2002). "[E]vidence that a defendant could have safely avoided using deadly force is normally relevant in determining whether it was *reasonably necessary* for him to kill his assailant." *Id.*

Morningstar even with affirmative proof that he ordered Williams to stop. The essence of Donaldson's determination was that based on the witnesses' accounts and the video, Williams "got shot for no apparent reason,"and that "when you have a dead body and you have a videotape of the crime and there's no good reason that's visible on that videotape or from any witness, that's the sort of the case that you take to the jury." As Donaldson testified, a reasonable person might conclude that Morningstar could have effectively neutralized Williams, whose pants were wrapped around his ankles, by spraying him with mace or striking him with his collapsible baton, or used his hand training, but without deadly force. The determination of probable cause is not foolproof. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983); other citation omitted)); *Illinois v. Rodriguez*, 497 U.S. 177, 196 (1990) ("[T]he possibility of factual error is built into the probable cause standard, and such a standard, by its very definition, will in some cases result in the arrest of a suspect who has not actually committed a crime." (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949))).

### 2. Malicious-Prosecution Claims Against Mix and Wheatley

Morningstar also relies on Mix's and Wheatley's statements as the basis for his malicious-prosecution claim, which alleges that defendants lied to initiate the criminal case against him. *See Matthews v. Blue Cross & Blue Shield*, 572 N.W.2d 603, 609 (Mich. 1998) (explaining that plaintiff

in a malicious-prosecution action must prove, *inter alia*, that defendant initiated, continued or maintained a criminal prosecution against him).

Under Michigan law, "a defendant cannot be held liable for [initiating] malicious prosecution unless he took some active role in instigating the prosecution." *King v. Arbic*, 406 N.W.2d 852, 858 (Mich. Ct. App. 1987) (quoting *Rivers v. Ex-Cell-O Corp.*, 300 N.W.2d 420, 424 (Mich. Ct. App. 1980)). Thus, there can be no liability where the decision to prosecute is not based on information or statements supplied by the defendant, but results from an independent investigation by the prosecutor or the police department. *See Matthews*, 572 N.W.2d at 613 ("[T]he prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution." (citation and footnote omitted)). Furthermore, Michigan courts have held:

> "[T]he only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause." Failure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution. In the final analysis, the Court in *King* has narrowly focused the issue as
>
>> [i]s there any evidence in the record, as it exists, which would give rise to the inference that defendant . . . knowingly included false facts in his incident report, without which the prosecutor could not have concluded there was probable cause?

*Payton v. City of Detroit*, 536 N.W.2d 233, 242-43 (Mich. Ct. App. 1995) (quoting *King*, 406 N.W.2d at 858-59) (other quotation marks and citations omitted). Thus, to succeed on his claim that defendants maliciously initiated the case against him, Morningstar must show that Mix and Wheatley knowingly made false statements that formed the basis of Donaldson's probable-cause

determination.  *See King*, 406 N.W.2d at 858-59; *Matthews*, 572 N.W.2d at 613 ("Unless the information furnished was known by the giver to be false and *was the information on which the prosecutor acted*, the private person has not procured the prosecution." (footnote omitted)).

Morningstar's argument on malicious prosecution is the same as for gross negligence, namely, that the district court impermissibly credited Donaldson's testimony over the other witnesses' and erroneously concluded that there was no issue of material fact for the jury to decide. However, reviewing the record as a whole, the evidence confirms Donaldson's testimony that he made the warrant recommendation based on the totality of the record in existence at the time.  It is true that this record included Mix's and Wheatley's police reports and their subpoenaed testimony, and that Morningstar offered strong evidence suggesting that Mix and Wheatley were untruthful when they claimed to be standing outside of their car at the time of the shooting.  However, neither Mix nor Wheatley affirmatively asserted that Morningstar did not order Williams to stop, and there is no evidence that Donaldson's decision to prosecute was based on false information about Mix's and Wheatley's physical location at the time of the shooting.  Moreover, the evidence shows that the investigation was largely handled by the prosecutor's office, with assistance from DPD and MSP. There is nothing to suggest that Mix or Wheatley actively pressed for Morningstar to be prosecuted, or that they participated in the investigation.  Thus, the district court did not err in granting judgment as a matter of law on Morningstar's malicious-initiation claim.

The court also correctly held that Mix did not maintain or continue Morningstar's criminal prosecution.  Mix wrote a police report and testified under subpoena, but unlike Wheatley, she did

not testify at the preliminary examination. Since Mix played no role in the case after charges were filed, no reasonable jury could have found that she helped continue the prosecution.

### 3. Claim Against the City of Detroit

A plaintiff deprived of his rights under color of state law may sue a municipality under 42 U.S.C. § 1983 if the injury complained of resulted from, or was facilitated by, the execution of an official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978); *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008).

Morningstar claims that Mix and Wheatley violated his rights under the Fourth Amendment of the United States Constitution by making false statements that led to his being charged with murder. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) (holding that a Fourth Amendment violation may lie where a police officer fabricates evidence and manufactures probable cause). Morningstar further alleges that the City's failure to train officers to use the in-car video system facilitated Mix's and Wheatley's ability to exploit deficiencies in the system to make and conceal false testimony.

To succeed on a § 1983 failure-to-train claim, a plaintiff must show that: (1) the training program is inadequate to the tasks that the officers must perform; (2) the failure to train evidences a deliberate indifference to the rights of persons with whom the officers come into contact; and (3) the deficiency is "closely related to" or "actually caused" the injury. *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989); *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

Morningstar is unable to prove that his injury was actually caused by, or closely related to, the City's failure to train officers in digital-video technology. Fredericks testified that some factual inaccuracies in Mix and Wheatley's testimonies could have been caused by glitches in the digital image-capture system, which the officers internalized when they reviewed the recording, thus tainting their recollection of the event. However, Fredericks did not assert or imply that proper training could avert such mistakes or prevent officers from exploiting the system's flaws. Instead, when questioned about the detriment of using an obsolete video policy, Fredericks explained that untrained officers would not know how to authenticate digital recordings from in-car cameras and preserve their chain of custody. Thus, even if one assumes, *arguendo*, that Donaldson's probable-cause finding resulted from, or was partly based on, a video-recording error, there is no evidence that proper training in digital-video technology would have prevented Morningstar's prosecution.

Morningstar also fails to show that the City was deliberately indifferent in failing to update its video-training policy after shifting to digital technology. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference may be shown in either of two ways:

> [First, the plaintiff can] "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." In the alternative, "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."

*Plinton*, 540 F.3d at 464 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Brown*, 520 U.S. at 409). In either case, the plaintiff "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. Morningstar presents no other situation where failing to train officers in digital-video technology resulted in unlawful conduct, nor does he claim that the City's policy was unconstitutional on its face. Therefore, he must prove that the violation of his rights was a highly predictable, or plainly obvious, consequence of the City's failure to train. *See Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006) (citing *Brown*, 520 U.S. at 412).

There is no evidence that the injury of which Morningstar complains was a known or obvious consequence of failing to train officers to use the in-car video system. Fredericks testified that untrained officers were likely to make errors of manipulation that could compromise the authentication of digital recordings and the chain of custody. However, he did not suggest that manipulation of recordings in criminal prosecutions is a highly predictable consequence of failing to train officers in the use of digital-video equipment, nor did Morningstar adduce evidence to that effect. Additionally, there is no evidence that City officials were aware that their video-training policy needed updating, much less that they deliberately ignored the problem. Fredericks testified that it is common practice for police departments adopting a new technology to issue policy guidelines before the new system is implemented. Morningstar also places great emphasis on Fredericks's testimony that the digital system's unreliability would have been "painfully obvious" to anyone with experience using analog materials. However, Fredericks was unable to say whether

City officials had actual knowledge of the system's shortcomings before April 2005. Finally, even if officials were aware of the system's technological flaws, there is no evidence that they also knew the training policy needed updating.

Since Morningstar is unable to show that his injuries resulted from, or were facilitated by, the City's failure to train, the district court rightly granted judgment as a matter of law.

## **CONCLUSION**

The rulings of the district court are **AFFIRMED**.